IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J & J SPORTS PRODUCTIONS, INC., AS Broadcast Licensee of the May 4, 2013 Floyd Mayweather, Jr. v. Robert Guerrero, WBC Welterweight Championship Fight Program, <br><br> Plaintiff, <br><br> v. <br><br> 1) WILLIE RAY'S PRIVATE ROOM, INC., individually, and d.b.a. WILLIE RAY'S PRIVATE ROOM d.b.a. WILLIE RAY'S EVENT CENTER d.b.a. WILLIE RAY'S PLACE, and <br> 2) CLINTON GARLAND a.k.a. CLINTON McCARTHY GARLAND, individually, and d.b.a. WILLIE RAY'S PRIVATE ROOM d.b.a. WILLIE RAY'S EVENT CENTER d.b.a. WILLIE RAY'S PLACE, and <br> 3) MICHELLE CRITESER, individually, and d.b.a. WILLIE RAY'S PRIVATE ROOM d.b.a. WILLIE RAY'S EVENT CENTER d.b.a. WILLIE RAY'S PLACE, <br><br> Defendants, | § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 3:16-CV-1206-D <br><br> Jury Trial Demanded |

**DEFENDANT MICHELLE FLOYD'S ANSWER TO COMPLAINT, COUNTERCLAIM, AND DEMAND FOR JURY TRIAL**

**ANSWER**

Defendant Michelle Floyd (neé Criteser) ("Floyd") submits this Answer to Plaintiff J & J Sports Productions, Inc.'s ("J & J") Complaint as follows:

Parties

1. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

2. Floyd admits the allegations set forth in the first and third sentences of this paragraph. Floyd denies the remaining allegations.

3. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

4. Floyd admits that she resides in Texas. Floyd admits that she was properly served with process. Floyd admits that she was an officer of Willie Ray's Private Room, Inc. on May 4, 2013. Floyd denies the remaining allegations in this paragraph.

### Jurisdiction

5. Admitted.

### Venue

6. Admitted.

### Statement of Claim

7. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

8. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

9. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

10. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

11. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

12. Floyd lacks sufficient information to admit or deny the allegations set forth in this paragraph.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

17. Denied.

### Violation of 47 U.S.C. § 553 or § 605

18. Denied.

### Demand for Relief Sought

Floyd responds to the allegations set forth in this section and states that J & J seeks relief that in no way is supported by the facts J & J alleged in its Complaint. Floyd further states that District Court Judges and Magistrate Judges nationwide have, *for years*, admonished J & J for seeking such exorbitant awards, pre-judgment interest, and injunctions. And, to the extent the allegations set forth in this section require a response, Floyd denies that J & J is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense – (Waiver)

1. J & J's 47 U.S.C. § 553 and § 605 claims are barred, in whole or in part, by the doctrine of waiver.

2. On information and belief, and unknown entity granted J & J the exclusive nationwide commercial distribution rights to the Floyd Mayweather, Jr. vs. Robert Guerrero, WBC Championship Program of May 4, 2013 (the "Program") by which J & J owned the right to prevent, stop, or demand cessation of unauthorized receipt of the Program by any entity.

3. On information and belief, on or before May 4, 2013, J & J solicited auditors via internet postings or another means of communication to investigate and document unlicensed reception of the Program at commercial establishments in and around the Texas, including the Dallas-Ft. Worth Metropolitan Area. On information and belief, on or before May 4, 2013, an auditor (the "Auditor") responded to J & J's solicitation and the parties agreed that J & J would pay money to the Auditor to investigate and document unlicensed reception of the Program at commercial establishments.

4.     On information and belief, on or before May 4, 2013, Co-defendant Clinton Garland purchased access through a television signal provider to receive the Program at Willie Ray's Private Room (the "Establishment"). At all times relevant to J & J's claims, Floyd had no knowledge or notice of J & J's existence, the requirement to purchase a commercial license from J & J to lawfully receive the Program at Establishment, or that the television signal provider lacked the authority to lawfully transmit the Program to Establishment absent J & J's authorization.

5.     On information and belief, before the Program aired, J & J and/or the Auditor had notice and/or knowledge that lacking J & J's authorization to do so, Garland obtained access and intended to receive the Program at Establishment. At no time prior to the Program's airing did J & J and/or Auditor attempt to protect J & J's rights by educating, informing, or warning Floyd of J & J's rights. On information and belief, at no time prior to the Program's airing did J & J and/or Auditor attempt to protect J & J's rights by educating, informing, or warning Garland of J & J's rights.  At no time prior to the Program's airing did J & J and/or the Auditor attempt to protect J & J's rights by taking steps–such as a telephone call to Floyd–to prevent or stop receipt of the Program at the Establishment. On information and belief, at no time prior to the Program's airing did J & J and/or the Auditor attempt to protect J & J's rights by taking steps–such as a telephone call to Garland–to prevent or stop receipt of the Program at the Establishment.

6.     On information and belief, on May 4, 2013, the Auditor entered the Establishment and observed the Program on a television therein.

7.     At no time during his visit to the Establishment did the Auditor educate, inform, or warn Floyd of J & J's existence or the requirement to purchase a license from J & J to receive the Program at a commercial establishment. On information and belief, at no time during his visit to the Establishment did the Auditor educate, inform, or warn Garland of J & J's existence or the requirement to purchase a license from J & J to receive the Program at a commercial establishment. On information and belief, at no time did Martinez attempt to

prevent, stop, or demand cessation of the unauthorized receipt of the Program.

8. J & J was aware of its rights to prevent, stop, or demand cessation of the unauthorized receipt of the Program and undertook no act to do so. On information and belief, J & J instructed the Auditor to not attempt prevent, stop, or demand cessation of the unauthorized receipt of the Program at the Establishment nor educate, inform, or warn Floyd or Garland of J & J's rights.

9. By J & J's and the Auditor's knowing and voluntary conduct described herein, J & J allowed and/or consented to unauthorized receipt of the Program at the Establishment and J & J thereby waived its property rights with respect to this lawsuit.

<u>Second Affirmative Defense – (Failure to Mitigate Damages)</u>

10. Floyd references and incorporates paragraphs 1 – 9 of her Affirmative Defenses.

11. Should it prevail on any claim, J & J's purported damages should be diminished according to J & J's failure to mitigate damages.

12. Pursuant to 47 U.S.C. §553 and §605, J & J is entitled to seek both statutory and enhanced damages against an entity that received the Program without J & J's authorization. Over the years, District Courts have developed several approaches to enhanced damages awards. According to one approach, J & J regularly urges District Courts to award enhanced damages based upon a purported loss of goodwill among customers. J & J claims that entities that purchased J & J's authorization to receive programs in the past may not do so in the future because signal piracy effectively eliminates competition among commercial establishments. Moreover, J & J has argued that its paying customers lose money because they are forced to charge premiums for food, drinks, or admission, while those who do not pay for programs need not charge premiums to cover the cost of a program.

13. J & J's alleged loss of goodwill, if real, is in whole or in part, due to J & J's conscious decision to allow unauthorized reception of the Program at the Establishment in order to establish the foundation for its lawsuit.

14. If J & J and/or the Auditor educated, informed, or warned Floyd of the need to purchase a license to receive the Program at the Establishment, Floyd would have contacted Garland and informed him of J & J's existence and the need to purchase a license from J & J. On information and belief, if J & J and/or the Auditor educated, informed, or warned Garland of the need to purchase a license to receive the Program at the Establishment, Garland would have either purchased the license or not received the Program or discontinued receipt.

15. J & J failed to take reasonable steps to mitigate its purported damages before, during, and after received the Program was received at the Establishment.

## COUNTERCLAIM

Floyd brings the following counterclaims, and states as follows:

<u>Jurisdiction</u>

1. This Court has supplemental jurisdiction over this counterclaim under 28 U.S.C. § 1367, as Floyd's State-based counterclaim arises directly from J & J's Complaint claims, allegations, and J & J's conduct related thereto.

<u>Venue</u>

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

<u>Statement of Counterclaim</u>

3. On information and belief, and unknown entity granted J & J the exclusive nationwide commercial distribution rights to the Floyd Mayweather, Jr. vs. Robert Guerrero, WBC Championship Program of May 4, 2013 (the "Program") by which J & J owned the right to prevent, stop, or demand cessation of unauthorized receipt of the Program by any entity.

4. On information and belief, on or before May 4, 2013, J & J solicited auditors via internet postings or another means of communication to investigate and document unlicensed reception of the Program at commercial establishments in and around the Texas, including the Dallas-Ft. Worth Metropolitan Area. On information and belief, on or before May 4, 2013, an auditor (the "Auditor") responded to J & J's solicitation and the parties

agreed that J & J would pay money to the Auditor to investigate and document unlicensed reception of the Program at commercial establishments.

5. On information and belief, on or before May 4, 2013, Co-defendant Clinton Garland purchased access through a television signal provider to receive the Program at Willie Ray's Private Room (the "Establishment"). At all times relevant to J & J's claims, Floyd had no knowledge or notice of J & J's existence, the requirement to purchase a commercial license from J & J to lawfully receive the Program at Establishment, or that the television signal provider lacked the authority to lawfully transmit the Program to Establishment absent J & J's authorization. On information and belief, at all times relevant to J & J's claims, Garland had no knowledge or notice of J & J's existence, the requirement to purchase a commercial license from J & J to lawfully receive the Program at Establishment, or that the television signal provider lacked the authority to lawfully transmit the Program to Establishment absent J & J's authorization.

6. On information and belief, before the Program aired, J & J and/or the Auditor had notice and/or knowledge that lacking J & J's authorization to do so, Garland obtained access and intended to receive the Program at Establishment. At no time prior to the Program's airing did J & J and/or Auditor attempt to protect J & J's rights by educating, informing, or warning Floyd of J & J's rights. On information and belief, at no time prior to the Program's airing did J & J and/or Auditor attempt to protect J & J's rights by educating, informing, or warning Garland of J & J's rights.  At no time prior to the Program's airing did J & J and/or the Auditor attempt to protect J & J's rights by taking steps–such as a telephone call to Floyd–to prevent or stop receipt of the Program at the Establishment. On information and belief, at no time prior to the Program's airing did J & J and/or the Auditor attempt to protect J & J's rights by taking steps–such as a telephone call to Garland–to prevent or stop receipt of the Program at the Establishment.

7. On information and belief, on May 4, 2013, the Auditor entered the Establishment and observed the Program on a television therein.

8. At no time during his visit to the Establishment did the Auditor educate, inform, or warn Floyd of J & J's existence or the requirement to purchase a license from J & J to receive the Program at a commercial establishment. On information and belief, at no time during his visit to the Establishment did the Auditor educate, inform, or warn Garland of J & J's existence or the requirement to purchase a license from J & J to receive the Program at a commercial establishment. On information and belief, at no time did Martinez attempt to prevent, stop, or demand cessation of the unauthorized receipt of the Program.

9. J & J was aware of its rights to prevent, stop, or demand cessation of the unauthorized receipt of the Program and undertook no act to do so. On information and belief, J & J instructed the Auditor to not attempt prevent, stop, or demand cessation of the unauthorized receipt of the Program at the Establishment nor educate, inform, or warn Floyd or Garland of J & J's rights.

10. On information and belief, a license to receive the Program at the Establishment would have cost $2,200.00. Costs for similar programs has remained fairly stable at $2,200.00 for a number of years. For those commercial entities who were/are aware of those programming costs, many decided, and continue to decide, not to purchase a license or show the programming because the costs are simply too high.

11. Since the early 1990's, J & J and similar entities (many of whom are represented by the same handful of attorneys and/or law firms) have brought thousands or lawsuits that have alleged near-identical claims to those at issue in this matter. Due in large part to out-matched defendants or default judgments, 47 U.S.C. §§ 553 and 605 case law has evolved to a point that heavily favors plaintiffs. As to plaintiffs' Federal claims, District Courts regularly award "statutory" damages far in excess of the Program's initial cost–at times three to four times the amount. Sections 553 and 605 also vest District Courts with the authority to grant "enhanced" damages, often inflating plaintiffs' take into the tens of thousands of dollars. Combined with near-certain awards for ubiquitous conversion claims–despite the fact that such awards constitute impermissible duplicative recovery–plaintiffs'

lawsuits regularly earn them four to eight times the Program's actual license cost.

12. With extensive experience with such lawsuits, J & J has developed a business model whereby it prepares extensively to build the foundations of its claims–solicit experienced auditors, provide form affidavits to ensure a complete factual record, and file refined complaints that have garnered past success–instead of taking steps to prevent or stop unauthorized reception of its programming.

13. J & J undertook its conduct of inaction, and concealed from potential signal pirates its property rights claims, in order to reap windfall benefits in the form of statutory and enhanced damages awards that District Courts regularly add to compensatory damages awards that equal a program's initial license cost.

14. On information and belief, the number of licenses J & J sells is relatively small compared to the number of lawsuits J & J files in District Courts; by way of example, District Courts in New York twice noted that the plaintiff sold between 30 and 50 licenses throughout the entire State for two particular programs. J & J has filed thousands of lawsuits since the early 1990's, and Floyd is informed and believes that J & J has reached out-of-court settlements for a very large number of alleged claims in that same time period.

First Cause of Action – Violation of Tex. Bus. & Com. Code §17.41 *et seq.*

15. Floyd references and incorporates paragraphs 1 – 14 of Counterclaim.

16. J & J knew of information with regard to its property rights in the Program.

17. J & J concealed and failed to disclose information with regard to its property rights in the Program despite knowing prior to reception of the Program at the Establishment that such reception would occur.

18. J & J concealed and failed to disclosed its property rights in the Program with the intent to assure that Willie Ray's Private Room, Inc.–of which Floyd was a director– would not cancel its purchase of the Program from the television service provider.

19. Willie Ray's Private Room, Inc.–of which Floyd was a director–would not have entered, or would have canceled, its order for the Program had J & J not concealed or

failed to disclose its property rights in the Program.

20. By its conduct, J & J sought to take advantage of Floyd, Garland, and Willie Ray's Private Room, Inc.'s lack of knowledge of J & J's existence and/or the requirement of a commercial license to receive the Program at the Establishment.

21. As a proximate result of J & J's conduct, Floyd has sustained harm.

22. J & J's conduct is grossly unfair in that it subjects Floyd (and Garland and Willie Ray's Private Room, Inc.) to potentially ruinous damages awards when J & J had every opportunity to avert its purported damages, but decided to capitalize them instead.

## PRAYER FOR RELIEF

WHEREFORE, Floyd prays that this Court enter a judgment:

A. Against J & J and in Floyd's favor;

B. Dismissing J & J's Complaint in its entirety with prejudice;

C. Damages according to proof;

D. Attorneys' fees allowed by law;

E. Punitive damages on respective causes of action;

F. Floyd's costs and disbursements;

G. And all other relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Floyd hereby requests a jury trial for all issues triable by jury, including but not limited to, those issues and claims set forth in any amended complaint, counterclaim, third-party complaint, or consolidated action.

Dated: December 23, 2016                    Respectfully submitted,


                                                    */s/ Trevor McCann*
                                                    Trevor McCann
                                                    Attorney-in-charge
                                                    California State Bar No. 243724
                                                    trevor@tbmclaw.com

                                                    Law Office of Trevor Brandt McCann
                                                    1595 Sunnyvale Avenue, #17
                                                    Walnut Creek, California 94597
                                                    Tel.: (925) 270-7058
                                                    Fax: (925) 955-1613

<u>CERTIFICATE OF SERVICE</u>

On December 23, 2016, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel and parties of record electronically or by another means authorized through Federal Rule of Civil Procedure 5(b)(2) and Local Rule 7.2.

<u>*/s/ Trevor McCann*</u>

Trevor McCann